UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NAOMI E. DARDEN, | ) |
| Plaintiff, | ) |
| vs. | ) 10 C 4225 |
| INGALLS MEMORIAL HOSPITAL, | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This case comes before the Court on Defendant Ingalls Memorial Hospital's ("Ingalls") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, the motion is granted.

### BACKGROUND[1]

Ingalls employed Plaintiff Naomi Darden ("Darden") as a Food Service Assistant from approximately September 1992 until April 2010, when it terminated her employment. Darden, an African-American woman, was 53 years old at the time of her termination.

---

[1] Darden did not respond to Ingalls' summary judgment motion or statement of material facts. Accordingly, the facts set forth in Ingalls' statement of material facts and supported by the record are deemed admitted. See N.D. Ill. L.R. 56.1(b)(3)(C).

Darden subsequently filed suit against Ingalls, alleging race and sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623, and disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112. Aside from her general allegations of discrimination, Darden also alleges that Ingalls discriminated against her because of her husband's disabilities and for expressing an interest in joining a union ten years before her termination.

**Darden's Employment with Ingalls**

As a Food Service Assistant, Darden worked on the tray line. The tray line operates like an assembly line, with a Food Service Assistant assigned to each station on the line: coordinator, soups, entrees, dessert, coffee, and checker. Darden was assigned to the entrees station. As trays move past the stations on a conveyor belt, each Food Service Assistant consults a menu ticket, which is completed by a patient or doctor, to determine the appropriate type and amount of food to place on the plate. Because meals are being prepared for hospital patients with varying dietary restrictions and allergies, it is important for the Food Service Assistants to place the correct food item and amount on the tray. The Food Service Assistants use different size serving utensils to properly apportion food. Darden understood the importance

of accuracy and that a patient could become ill or die if the patient received the wrong amount or type of food.

Because the tray line operates as an assembly line, Ingalls requires Food Service Assistants to remain at their stations while the tray line is operating. If a Food Service Assistant leaves the tray line, trays may pass a station without having the appropriate items placed on them. So that Food Service Assistants need not leave the tray line, Food Service Assistants running low on food ask the cooks to bring additional food to their stations. Also, to ensure proper food temperature, Food Service Assistants must maintain proper water levels in the steam wells.

Jennifer Aidinovich ("Aidinovich") supervised the Food Service Assistants and was Darden's direct supervisor from 2002 until Darden's termination in 2010. During that same time period, Katie Freese ("Freese") was Aidinovich's immediate supervisor and oversaw all employees in Ingalls' Food and Nutrition Department. To evaluate the Food Service Assistants' accuracy on the tray line, Aidinovich, Freese, or a dietetic intern regularly conducted Tray Accuracy Audits. During these audits, items on the meal trays were checked against patients' prescribed diets.

Aidinovich and Freese were also responsible for administering disciplinary action according to Ingalls' progressive discipline policy. Under this policy, discipline begins with a verbal warning and then progresses to a written warning, a one day unpaid suspension, and then termination. An employee usually first receives

a verbal warning for unsatisfactory work performance or minor violations of hospital policy. A written warning generally follows a verbal warning if the violation is not corrected. According to Ingalls' Code of Conduct, an employee's failure to improve job performance after oral or written warnings may lead to an unpaid suspension day or discharge. Darden knew of and understood Ingalls' progressive discipline policy.

**Darden's Work Performance**

Aidinovich prepared Darden's annual performance reviews each June for her work performance the year before. On Darden's 2006-2007 performance review, which Aidinovich discussed with Darden in June 2007, Aidinovich rated Darden as meeting expectations. For the following year, Aidinovich directed Darden to improve her accuracy on the tray line and maintain proper water levels in the steam wells.

Darden was disciplined on three occasions in the year following her 2006-2007 performance review. Specifically, on July 25, 2007, Darden received a verbal warning from Aidinovich for failing to give the cooks sufficient notice that she needed additional food, which caused the tray line to stop, and failing to fully replenish the steam wells with water before leaving her station after breakfast. Then, on September 19, 2007, Freese issued Darden a written warning because Darden left the tray line to obtain additional food instead of asking the cooks to bring it to her station. Finally, on January 30, 2008, Freese verbally counseled Darden for failing

to maintain the proper food temperature by pre-plating food.  Although Darden does not remember this event, Aidinovich documented it in a "verbal discussion documentation."

On Darden's 2007-2008 performance review, which Aidinovich discussed with Darden in June 2008, Aidinovich again rated Darden as meeting expectations.  For the upcoming year, Aidinovich directed Darden to maintain proper food and equipment temperature and to not pre-portion food.  Between June 2008 and June 2009, Darden was disciplined on four occasions.  Specifically, on February 25, 2009, Aidinovich verbally counseled Darden for using the wrong size serving utensil for an entree.  Then, on March 11, 2009, Aidinovich issued Darden a verbal warning for leaving the tray line.  A few months later, on May 1, 2009, Aidinovich and Freese asked Darden to improve her accuracy on the tray line and communication with coworkers.  The next day, on May 2, 2009, Darden received a written warning after a Tray Accuracy Audit revealed that she made twelve errors.  Darden admittedly performed worse than any of her coworkers during the audit.

On Darden's 2008-2009 performance review, which Aidinovich discussed with Darden in June 2009, Aidinovich rated Darden as meeting expectations.  For the following year, Aidinovich advised Darden to focus on tray accuracy by not missing more than three food items per meal period and communicate to the cooks when she needs additional food.

That same month, on June 24, 2009, Darden served the wrong amount of food by using the wrong size serving utensil. Aidinovich also complained that Darden failed to participate in a team building activity during a department meeting. For these infractions, Aidinovich issued Darden a one day unpaid suspension.

On December 2, 2009, Aidinovich created a "record of coaching and counseling," which reflected that she verbally counseled Darden for improperly doubling the amount of food on numerous patient trays. Darden does not recall whether she made this mistake.

On several occasions, Darden agreed to improve her tray accuracy. Despite her assurances, Tray Accuracy Audits revealed that Darden made eight errors on April 9, 2010, and a total of twenty-one errors during breakfast and lunch on April 16, 2010. On April 16, 2010, Aidinovich and Freese terminated Darden's employment. According to Aidinovich and Freese, they informed Darden that her employment was being terminated for unsatisfactory work performance. During her deposition, Darden acknowledged that her accuracy needed improvement and that she violated Ingalls' procedure on several occasions by leaving the tray line or failing to give sufficient notice to the cooks that she needed additional food.

Approximately three months later, Darden submitted a grievance to Ingalls complaining that her termination was the product of discrimination and harassment.

Although Ingalls' policy directs employees to immediately report harassment or discrimination, Darden never reported any such conduct while employed by Ingalls.

**Other Ingalls Employees**

Darden identified several other employees who allegedly received more favorable treatment. According to Darden, Evelyn Hart ("Hart") and Etter Garrett ("Garrett"), who are both female, black, and older than Darden, were not terminated after they overlooked a patient's food allergy.

Darden also identified three younger employees, including Michelle Edwards ("Edwards"), Rasheia West ("West"), and an unnamed female employee. Edwards was issued a one day unpaid suspension for using profanity and West received a verbal warning for her unsatisfactory work performance and involvement in a heated conversation with a coworker.

Additionally, Darden named two white males who purportedly received preferential treatment because they were not terminated for their actions. According to Darden, cook Greg Mossuto ("Mossuto") allegedly cursed at his supervisor Marco Papa, and Steve Graff ("Graff") injured a coworker by negligently turning on a machine.

**Darden's Alleged Disabilities**

Darden claims that she has three disabilities. First, Darden alleges that she has poor eyesight. Darden acknowledges that her eyesight is completely corrected with

prescription eyeglasses but stated that she sometimes failed to wear her eyeglasses to work, which purportedly affected her accuracy on the tray line because she could not read the menu tickets.  Second, Darden alleges that she is disabled because of her "trigger finger," which causes her finger to get stuck.  Darden had surgery for her condition, which temporarily corrected the problem.  According to Darden, her trigger finger did not prevent her from performing the functions of her job.  Finally, Darden alleges that she is disabled because her shoulder "went out" around 2003 or 2004.  After Darden received treatment for her shoulder, she was able to perform all of her job duties.

**Darden's Partial Repudiation of her Claims**

Darden made several harmful admissions during her deposition.  First, Darden admitted that she was not terminated because of her sex.  Second, Darden expressed uncertainty regarding whether age played a factor in her termination, stating that age might not have been a factor because some older employees "got away with" making mistakes on the tray line.  Third, Darden conceded that her husband's health problems did not influence her discipline or termination.  Finally, Darden admitted that her employment was not terminated because she wore eyeglasses, and that her interest in joining a union approximately ten years before her termination had nothing to do with her discipline.

**LEGAL STANDARD**

Summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 391-92 (7th Cir. 2011). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). A court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). To survive summary judgment, the non-moving party must present sufficient evidence for each element of its case on which it bears the burden at trial. *Dargis v. Sheahan*, 526 F.3d 981, 985 (7th Cir. 2008).

**DISCUSSION**

Darden asserts claims for race, sex, age, and disability discrimination.[2] Title VII, the ADEA, and the ADA prohibit an employer from discharging or otherwise discriminating against an individual because of such individual's race, sex, age, or

---

[2] During her deposition, Darden disavowed her claims for sex discrimination and for disability discrimination based on her husband's alleged disabilities. Accordingly, the Court grants summary judgment in favor of Ingalls on those disavowed claims. Even so, the Court finds that Darden's sex discrimination claim lacks merit. Additionally, Darden alleged in her complaint that she was harassed for expressing interest in joining a union approximately ten years before her termination. Darden, however, admitted at her deposition that she was not terminated for her interest in joining a union approximately ten years earlier. Thus, the Court grants summary judgment in favor of Ingalls on any such union-related claims.

disability.  42 U.S.C. § 2000e-2(a) (race and sex); 29 U.S.C. § 623(a) (age); 42 U.S.C. § 12112(a) (disability).  Ingalls moves for summary judgment on all of Darden's claims.

**I.     Darden's Claims for Race, Sex, and Age Discrimination**

A plaintiff alleging race, sex, or age discrimination may establish a prima facie case of discrimination directly or indirectly.  *Van Antwerp*, 627 F.3d at 297-98; *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008).  The record lacks any evidence pointing directly to a discriminatory reason for Darden's termination, such as an admission of discrimination by Ingalls.  *See Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004).  Accordingly, the Court will evaluate whether Darden can prove discrimination under the indirect method.

To establish a prima facie case of discrimination under the indirect method, Darden must prove that she (1) belongs to a protected class, (2) was satisfying Ingalls' legitimate expectations, (3) suffered an adverse employment action, and (4) was treated worse than similarly situated employees outside the protected class.  *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If Darden establishes a prima facie case and Ingalls articulates a non-discriminatory reason for the adverse action, Darden must then prove that Ingalls' stated reason is merely a pretext for discrimination.  *Id.*

First, Ingalls argues that Darden cannot demonstrate that she was satisfying its legitimate expectations. As a Food Service Assistant, Darden assisted in the preparation of patient meals. Because patients have varying dietary restrictions and allergies, Darden understood the importance of placing the correct type of food and accurate amount of food on each patient's plate. Darden acknowledged that her failure to place the correct type and amount of food on a patient's plate could cause serious consequences, including illness or death. Considering the risks to patient health, Ingalls legitimately expected Darden to maintain a reasonable level of accuracy when distributing food. Ingalls also legitimately expected the Food Service Assistants to request additional food from cooks, rather than leaving the tray line to obtain food, so that trays would not pass by a station without having the appropriate items placed on them.

The undisputed facts demonstrate that Darden failed to satisfy either of these legitimate expectations. Although repeatedly instructed to increase her accuracy, Darden consistently made errors and performed worse than her coworkers in the fourteen months preceding her termination. In February 2009, Darden was verbally counseled for placing an incorrect amount of food on patients' plates by using the wrong size serving utensil. The following month, Darden received a verbal warning for leaving the tray line. In May 2009, Darden received a written warning after a Tray Accuracy Audit revealed that she made twelve errors, the worst performance of

any worker on the tray line. In June 2009, Darden received a one day unpaid suspension after she again used the wrong size serving utensil. In December 2009, Darden was verbally counseled for placing twice the permissible amount of food on several plates. On April 9, 2010, a Tray Accuracy Audit revealed that Darden made eight errors. Finally, on April 16, 2010, a Tray Accuracy Audit revealed that Darden made a total of twenty-one errors throughout breakfast and lunch. Later that day, Ingalls terminated Darden's employment. Given Darden's substantial record of errors that jeopardized patient health, no reasonable juror could find that she was satisfying Ingalls' legitimate employment expectations. *See, e.g., Suarez v. Sacred Heart Hosp.*, 225 F. App'x 404, 406 (7th Cir. 2007) (holding that plaintiff failed to satisfy employer's legitimate expectations where she made errors that could have compromised patient care).

Second, Ingalls maintains that no similarly situated employees outside of the protected classes were treated more favorably than Darden. Darden identified several employees who purportedly received more favorable treatment, including Hart, Garrett, Edwards, West, Mossuto, and Graff. However, these employees are either not outside of the protected classes or not similarly situated to Darden. Specifically, Hart and Garrett are black, female, and older than Darden and thus are not outside of the protected classes. Accordingly, Darden cannot show race, sex, or age discrimination by demonstrating that Hart and Garrett received more favorable

treatment. *See Rodgers*, 657 F.3d at 517 (stating that plaintiff must identify employees outside the protected class). Additionally, the remaining employees are not similarly situated to Darden because they do not share a comparable set of failings with Darden. *See id.* at 520-21. Darden was consistently disciplined for the errors she made on the tray line, and no evidence exists that the other employees were disciplined for poor accuracy or made a similar number of errors as Darden. In fact, the Tray Accuracy Audits referenced in the record reveal that Darden greatly exceeded the number of errors made by any other Food Service Assistant. Accordingly, no reasonable juror could conclude that similarly situated employees outside of the protected classes received more favorable treatment than Darden.

For these reasons, Darden cannot present a prima facie case of race, sex, or age discrimination, and the Court grants summary judgment in favor of Ingalls on these claims.

## II. Darden's Claim for Disability Discrimination

To establish a prima facie case of disability discrimination, Darden must demonstrate, among other things, that she suffers from a disability under the ADA. *Dargis*, 536 F.3d at 985-86. Darden claims that she had three disabilities while employed with Ingalls: poor eyesight, a "trigger finger," and a shoulder injury. Ingalls argues that none of Darden's conditions constitute a disability under the ADA. A "disability" under the ADA is "a physical or mental impairment that

substantially limits one or more major life activities" of an individual. 42 U.S.C. § 12102(1). Major life activities include, but are not limited to, performing manual tasks, seeing, and working. 42 U.S.C. § 12102(2). When determining whether Darden's poor eyesight substantially limits a major life activity, the Court considers the "ameliorative effects of the mitigating measures of ordinary eyeglasses." 42 U.S.C. § 12102(4)(E)(ii). Darden concedes that prescription eyeglasses completely corrected her eyesight. Because Darden could completely correct her impairment by wearing ordinary eyeglasses, Darden's poor eyesight did not substantially limit her ability to see or any other major life activity. The fact that Darden sometimes failed to wear her glasses to work does not alter this Court's conclusion. Further, as to Darden's "trigger finger," Darden presented no evidence that her condition substantially limits any major life activity. Indeed, Darden admitted that her "trigger finger" did not prevent her from performing the functions of her job. Finally, concerning Darden's shoulder injury, Darden claimed that her shoulder "went out" around 2003 or 2004, but that she could perform all of her job duties after she received treatment. For these reasons, Darden cannot demonstrate that she suffers from a disability under the ADA, and the Court grants summary judgment in favor of Ingalls on Darden's claim of disability discrimination.

## CONCLUSION

For the foregoing reasons, this Court grants Ingalls' motion for summary judgment.

/s/ Charles P. Kocoras
Charles P. Kocoras
United States District Judge

Dated: March 21, 2012